**In The**
*Court of Appeals*
*Ninth District of Texas at Beaumont*
**NO. 09-24-00275-CR**

**MORGAN ALLEN SANDERS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 23-07-10752-CR**

**MEMORANDUM OPINION**

A grand jury indicted Appellant Morgan Allen Sanders ("Appellant" or "Sanders") for the offense of aggravated sexual assault of a child younger than fourteen, a first-degree felony. *See* Tex. Penal Code Ann. § 22.021(a)(2)(B). Sanders entered a plea of "not guilty," but a jury found him guilty as charged in the indictment. After hearing additional evidence on punishment, the trial court sentenced Sanders to twenty years of confinement. In a single issue on appeal, Sanders argues that the trial court erred by excluding the testimony of his expert

witness. As explained below, we overrule his issue and affirm the judgment of conviction.

Evidence at Trial

Testimony of Deputy Kyle Sullivan

Deputy Kyle Sullivan, with the Montgomery County Sheriff's Office, testified that he worked the night shift on Father's Day, June 19, 2023, and he received a call involving a sexual assault of a child. Sullivan recalled that the call referenced an incident at a home, however "Melodie,"[1] the complainant's mother, asked to meet him at a gas station. According to Sullivan, Melodie filled out a voluntary written statement about the incident, and Sullivan's sergeant authorized a Sexual Assault Nurse Examiner ("SANE") examination. Sullivan identified photos of the residence involved in the incident and the photos were admitted into evidence. On cross-examination, Sullivan testified that he did not visit with the alleged victim.

Testimony of Melodie

Melodie testified that "Kayla" is her fourteen-year-old daughter and Sanders, the defendant, is her ex-husband. According to Melodie, after she married Sanders,

---

[1] We refer to witnesses other than law enforcement or medical personnel by pseudonyms. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

she and Kayla lived with Sanders along with his three sons. Kayla lives part-time with Melodie and part-time with Kayla's biological father.

According to Melodie, the home they lived in with Sanders has a game and TV room where Sanders set up a massage table. Melodie testified that Kayla was active in sports since she was about age six or seven, including basketball, horse riding, and running track. According to Melodie, Kayla complained about muscle soreness from time to time. Melodie recalled that, when Kayla was about twelve years old, Sanders started helping Kayla with stretching and massage to help her soreness, although Sanders is not a massage therapist. Melodie testified that the massages were initially done in the living area, but at some point, Sanders moved the massage table to the upstairs game room.

Melodie recalled that after dinner on June 19, 2023, Sanders gave Kayla a massage because Kayla had said her legs were bothering her. Melodie thought Kayla was more quiet than usual after the massage. Melodie testified that the next morning, Kayla said she did not feel well and was not going to school, and Kayla went to stay with her biological father that day. According to Melodie, later in the morning she received a call from Kayla, and Kayla was "crying hysterically." Melodie testified that Kayla told her, "He [Sanders] touched me[,]" and that Sanders "inserted his finger inside her vagina [] when he massaged her [] [t]he night before." At that point, Melodie left work and went to get Kayla, she confronted Sanders when she got

3

home, and he said he did not do it. Melodie recalled that she packed a bag, and when she left, Sanders did not appear upset. According to Melodie, when she left, she went to her ex-husband's house where Kayla was, and after a while, she left the house and called the police. Melodie recalled that she met Deputy Sullivan at a gas station, she told him what Kayla reported, and she gave the Deputy a written statement. At some point, Melodie took Kayla to Safe Harbor for a forensic interview and for a SANE exam. Melodie testified that on June 19, 2023, Kayla was thirteen years old. According to Melodie, she decided to divorce Sanders after Kayla's outcry. Melodie identified the defendant as Sanders, her ex-husband and Kayla's stepfather.

Testimony of "Jerry"

Jerry testified that he knew Sanders because his son played sports with Sanders's boys. Jerry recalled that in 2020, Sanders started working for his home construction company, where Sanders became a superintendent. According to Jerry, one time Sanders told him that Kayla had begun menstruating and that "[s]he's a woman now[,]" and Jerry told Sanders it was "awkward" and he did not want to hear about it. Jerry also recalled Sanders telling him that Kayla had "a thick ass like her mother[,]" which Jerry also regarded as awkward. Jerry testified that Sanders had talked to him about giving Kayla massages. On cross-examination, Jerry testified that he never allowed his daughter to be alone with Sanders.

4

Testimony of Detective Joshua Leal

Joshua Leal testified that he is a detective with the Montgomery County Sheriff's Office assigned to the Special Victims Unit, and he was assigned to the case involving Sanders on June 20, 2023. Leal recalled that he contacted Melodie, and after speaking with her, he scheduled a forensic interview for Kayla. According to Leal, a SANE exam had already been scheduled when the case was assigned to him. Leal testified that, after the forensic interview had occurred, he went to the home where Kayla alleged the incident occurred to take photos.

Leal testified that he attempted to contact Sanders several times regarding Kayla's allegations and Sanders would not talk to him. After reviewing the results of the SANE exam, Leal attempted to go to a hospital where Sanders was a patient to interview him, and Sanders would not talk to Leal. Leal recalled that he presented the District Attorney's Office with the evidence he had gathered, and he was in contact with Sanders when Sanders was arrested.

According to Leal, the SANE exam of Kayla was performed on June 20, 2023, and the forensic interview was on June 22, 2023. Leal testified that, in his professional experience, cases of sexual abuse by digital penetration do not always involve physical injuries, DNA, or biological evidence.

Testimony of Kari Prihoda

Kari Prihoda testified that she is the program director at Children's Safe Harbor, where she has worked for eighteen years and where she is also a forensic interviewer. Prihoda recalled that she interviewed Kayla on June 22, 2023, and Kayla was "kind" during the interview, she was not upset, and she hesitated a few times as though "unable to find her words." Prihoda testified that Kayla made a disclosure during the interview. In Prihoda's opinion, Kayla made a "pretty quick outcry, almost immediate[,]" Kayla was "actively ready to talk about what happened[,]" and Kayla did not recant or take back anything she said during the interview. Prihoda recalled that, in her interview, Kayla gave sensory details and said she felt scared and uncomfortable.

Testimony of Erica Cuscina

Erica Cuscina testified that she is a registered nurse and a forensic nurse examiner. Cuscina agreed that she performed a forensic medical exam of Kayla in this case, when Kayla was thirteen years old. Cuscina recognized State's Exhibit 18 as the record of her forensic medical exam of Kayla on June 20, 2023. Cuscina read from her notes of her interview of Kayla as follows:

Cuscina: Do you know why you were brought here?

[Kayla]: Um, the incident that happened yesterday or the day before, Sunday.

Cuscina: Can you tell me about the incident?

6

[Kayla]: Um. So, okay, so, um, so when my stepfather, he asked me, because he, like - - because I play sports and stuff, he massaged me and stretched me, but I've never asked him to do it. He's always asked me.

And then - - so he asked me to massage - - no, stretch first. Stretch. And so he stretched me and stuff and then I was done and I was hanging out with my brothers. But while he was stretching me, he found two knots in my groin area on each side. And so after, then he asked me, [Kayla], do you want me to work on those knots, and I said, sure, and he did. He was massaging me. And then he, um, put his finger in my privates and - - yeah.

Cuscina: Has anything like this ever happened before?

[Kayla]: Huh-uh. [And patient shakes head side to side, indicating no.]

Cuscina: Where were you when this happened?

[Kayla]: I was on the massage table.
. . .
Cuscina: When you say he put his finger in your privates, do you have another name for that area?

[Kayla]: Um, like, vagina, I guess.

Cuscina testified that she did not find any genital injuries on Kayla, which did not surprise Cuscina based on the allegation of digital or finger penetration and because tissue in the genital area heals very quickly. Cuscina testified that she performed a buccal swab on Kayla to get DNA.

Testimony of Michelle Turner

Michelle Turner testified that she is a forensic scientist with the Texas Department of Public Safety ("DPS") in Houston where she works as a DNA analyst. Turner testified that she performed DNA testing in this case, and she recognized

State's Exhibit 20 as a copy of her DNA lab report. According to Turner, her report listed Sanders, the defendant, as the suspect and Kayla as the victim. Turner testified that no male DNA was detected in the swabs taken from Kayla. Turner testified that she could not say whether a sexual assault had occurred based on her analysis and that "[g]enerally speaking, just because you don't get DNA on an item of evidence doesn't mean something didn't occur."

Kayla's Testimony

Kayla was fourteen years old at the time of trial and she lives part of the time with her mother Melodie and part of the time with her father, stepmother, and stepbrothers. Kayla agreed that she likes to play a lot of sports, including basketball and running.

Kayla testified that there are parts of her body that no one is supposed to touch, including her privates, her chest area, her "butt," and her "no-no square." According to Kayla, her stepfather, Morgan Sanders, touched her in one of those body parts and she identified the defendant as Morgan Sanders. Kayla testified that sometimes Sanders would help her in sports by massaging knots out of her body. Kayla recalled that the massages began when she was about twelve years old and they occurred in the living room, and later Sanders bought a massage table that he put in the upstairs game room. Kayla testified that Sanders touched her on Father's Day when she was thirteen years old. She recalled that Sanders asked her if she wanted him to massage

8

knots out of her legs, and so she lay on the massage table. Kayla testified that Sanders told her to wear loose-fitting shorts and not to wear underwear during her massages. She recalled Sanders massaging her inner thighs and getting close to her "privates." According to Kayla, she told him he was getting close, he said "okay[,]" and then "he touched [her] privates[]" and "he put his finger inside [her] privates." Kayla recalled that Sanders moved his finger inside her privates. Kayla testified that she was scared and she "froze." She further testified that Sanders then took his finger out, and she "acted like nothing happened [] [b]ecause [she] never experienced something like that [] and [she] was [] still in shock and [] didn't know what to do." Kayla testified that he moved his finger around inside her, and she thought he did this on purpose. Kayla thought her mother was downstairs when it occurred, and although her little brother was in the room at the time, he would have been facing away from the massage table, watching tv.

Kayla recalled that the next morning she was going to her father's house, and she felt "uneasy" because "something just happened to [her] that [she] never experienced before [and she] didn't know what to do." She had not told her mother what happened because she was scared and did not know how her mother would react. Kayla testified that her mother dropped her off at her father's house, and she called her mother sometime in the afternoon to tell her mother what had happened because Kayla could not keep what happened to her inside. According to Kayla, she

9

told her mother that the night before her stepfather had touched her inappropriately while he was massaging her, and that he had put his finger inside of her. Kayla testified that later she went to Safe Harbor for an interview, she was examined by a nurse, and she told the interviewer and the nurse what had happened.

Kayla testified that there was another time about six months earlier, when Sanders "got close to [her] no-no and [she] told him to, like, back off[]" and on occasion he would also "slap [her] butt." According to Kayla, she knew it was not right for him to slap her behind, and it made her feel uncomfortable.

Testimony of "Hudson" and "Evan"

Sanders's sons "Hudson" and "Evan" testified for the defense. Hudson testified that he was thirteen years old at the time of trial and Sanders is his father. Hudson recalled playing sports with his father and that Sanders was involved with Kayla's sports. Hudson testified that he knew Kayla had made an accusation against Sanders, his father, and he recalled that his father gave Kayla a massage after they watched a movie on Father's Day. Hudson testified he did not hear Kayla cry out or tell his father to stop during the massage and that he talked to them while his father was giving Kayla the massage. He also agreed that sometimes his father gave him a massage. According to Hudson, after Kayla's massage that evening, all three of them got on the couch and "snuggled together."

10

Evan testified that he was fifteen years old at the time of trial and Sanders is his father. Evan testified that as he was growing up, his father attended his sports events. Evan recalled that he saw Kayla at Christmas of 2023, and she seemed "normal" and friendly. Evan testified that on Father's Day of 2023, his father gave Kayla a massage after dinner.

<u>Testimony of "Teresa" and "Kyle"</u>

Teresa and Kyle, a married couple, testified for the defense. Teresa testified that she had known Sanders for about fifteen years. She testified that she has two girls, ages fifteen and twenty-two, and she recalled that she had seen Sanders with her two children multiple times, and she never saw anything inappropriate. Teresa also testified that she had seen Sanders as a leader in a children's program at church. According to Teresa, she was aware of the charge against Sanders, and she would trust her daughters with him.

Kyle testified that he had known Sanders for about fifteen years, and Sanders attended the church that he and Teresa attend. Kyle also testified that Sanders had invited him to see some of Kayla's basketball games. Kyle testified that his two daughters play sports, and he has never seen any inappropriate or sexual behavior towards his children by Sanders. Kyle testified, "I've never seen anything that would concern me, and I've seen him around a lot of children at football games, [and] at church [] programs."

11

Testimony of "Josh"

Josh testified for the defense and explained that Sanders is his stepfather and Hudson and Evan are his half-brothers. Josh testified that he has known Sanders since Josh was ten years old and he also knew Kayla. Josh has an eight-year-old daughter who is not fully verbal and she is autistic, and he never had a problem with how Sanders played with or handled his daughter. Josh recalled that he had seen Sanders coach football, and he thought Sanders was "very protective over children."

Testimony of "Jimmy"

Jimmy testified for the defense and explained that he met Sanders in 2012 when their sons were playing football together. According to Jimmy, he had seen Sanders around "[l]ots of children[,]" and he had never seen anything concerning about Sanders's interactions with children. Jimmy had also seen Sanders around Jimmy's children—boys and girls both—and Jimmy testified that Sanders's interactions were moral and safe, and he believed that Sanders has good moral character.

Testimony of Morgan Sanders

Sanders testified that he was thirty-six years old at the time of trial, and he had suffered a self-inflicted gunshot. According to Sanders, after high school, he joined the Army where he served as a Ranger. Sanders testified that as an Army Ranger, he had served in multiple foreign zones. Sanders further testified that on one occasion

12

while he was in the Army, his parachute did not deploy correctly, he sustained multiple injuries to his back and legs, and he was medically discharged in 1999. Sanders testified that his military experience was "[m]entally and emotionally trying." According to Sanders, after leaving the military, he sought medical and psychological help from the VA. At some point, he married Melodie, and they had a blended family. Sanders testified that his oldest son died by suicide at age eighteen in 2022.

Sanders testified that he learned to give a massage when he was in sports as a child. He also testified that, in the Army, he learned combat medic stretching and physical training. Sanders testified that he tested to be a certified trainer, and he had been in physical therapy for five years. Sanders recalled that he started giving massages at home in 2017, he began with his wife Melodie, and later he gave massages to some of the children, and according to Sanders, Melodie was aware he gave Kayla massages.

Sanders testified that Kayla played basketball several days a week and she also had private lessons, and that Kayla was a good player. According to Sanders, Kayla also ran sprints, and Sanders was concerned that Kayla would work out her legs too much.

Sanders recalled that on June 19, 2023—Father's Day—after dinner, Kayla asked him to help her with soreness and knots in her legs. Sanders testified that they

13

did some stretches, and then he gave her a deep tissue massage. At some point, Kayla told him, "Dada, you're getting a little close to my no-nos[,]" and Sanders stopped the massage for a moment, and then resumed. Sanders testified that he did not put his finger inside Kayla. Sanders further testified that he uses his index finger or thumb to manipulate a muscle knot. Sanders recalled that Melodie called him the next day and accused him of touching Kayla. Sanders felt very upset by the accusation.

On cross-examination, Sanders agreed that on Tuesday night, after he and Melodie had talked on Monday and Melodie left the house, he shot himself in the head to kill himself. Sanders agreed that he texted with a friend and told the friend there was no evidence in this case, and he said, "if [he] put [his] fat finger into that tiny virgin no-no, there will be all kinds of evidence[.]"

On redirect, Sanders agreed that his military experience continues to live in his mind, but he did not come up with the idea to shoot himself, and he did not shoot himself because he did what he was accused of doing to Kayla. Sanders testified that he shot himself for Melodie and to "free[] [his] wife and [his] daughter[]" from the "monster" they believed he was and not because he felt guilty about the accusations against him. According to Sanders, he was in the hospital a little more than seven months after he shot himself.

Testimony of "Mack"

Mack testified that he had known Sanders since about 2004, and they had worked together offshore. Mack recalled that their families had gotten together over the years, and he had no reason to question Sanders's morality. Mack testified that he had never seen Sanders act inappropriately with his children and Mack would trust Sanders with Mack's children.

The jury found Sanders guilty as charged in the indictment. After hearing additional evidence on punishment, the trial court assessed punishment at twenty years of confinement. Sanders filed a Motion for New Trial and Motion for Arrest in Judgment challenging the exclusion of an expert witness offered by the defense, which was overruled by operation of law. Sanders filed a Notice of Appeal.

Issue

In a single issue, Appellant argues that the trial court abused its discretion by excluding the testimony of an expert witness offered by the defense. The expert witness was Rory Carruthers, a licensed professional counselor who had been Appellant's counselor. According to Appellant, Carruthers would have offered an opinion on the cause of Appellant's suicide attempt and would have offered an opinion that the attempt "was caused by a sense of duty rather than guilt." Appellant argues that, if the jurors had heard Carruthers's testimony, there is a reasonable likelihood that they would not have convicted him. Appellant concedes that the

15

defense disclosed the expert witness late and in violation of the standing discovery order.

## Standard of Review

We review a trial court's ruling on the admission or exclusion of evidence under an abuse of discretion standard of review. *Colone v. State*, 573 S.W.3d 249, 263-64 (Tex. Crim. App. 2019). A trial court abuses its discretion when it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld." *De La Paz v. State*, 279 S.W.3d 336, 343-44 (Tex. Crim. App. 2009) (quoting *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh'g)); *State v. Mechler*, 153 S.W.3d 435, 439-40 (Tex. Crim. App. 2005). If the trial court's decision is correct on any theory of law applicable to the case, we will uphold the decision. *De La Paz*, 279 S.W.3d at 344; *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002). The erroneous admission or exclusion of evidence is generally reviewed under the standard for non-constitutional error contained in Rule 44.2(b) of the Texas Rules of Appellate Procedure if the trial court's ruling merely offends the rules of evidence. *See Walters v. State*, 247 S.W.3d 204, 218-19 (Tex. Crim. App. 2007); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001).

Evidence is relevant if it has a tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *Gonzalez v. State*, 544 S.W.3d 363, 370 (Tex. Crim. App. 2018) (citing Tex. R. Evid. 401). Relevant evidence is generally admissible. *See* Tex. R. Evid. 402; *Gonzalez*, 544 S.W.3d at 370. Even if the evidence is relevant, a trial court may determine that it is not admissible for other reasons, including exclusion under evidentiary Rule 403. *See* Tex. R. Evid. 403.

In considering whether to admit expert testimony, a trial court acts as a gatekeeper and makes a threshold determination whether the testimony "will help the trier of fact understand the evidence or determine a fact in issue." *Kelly v. State*, 824 S.W.2d 568, 572 (Tex. Crim. App. 1992); *see also* Tex. R. Evid. 702 (requiring that expert testimony help the factfinder to understand the evidence or to determine a fact issue); *Somers v. State*, 368 S.W.3d 528, 536 (Tex. Crim. App. 2012). A trial court also must determine whether the expert's opinion is reliable—whether it is based on a valid scientific theory and a technique that is valid and properly applied. *See Kelly*, 824 S.W.2d at 573. Even if the trial court determines that an expert's testimony is reliable, the court must also apply Rule 403 to determine whether the expert's testimony might be unhelpful to the factfinder—for example, because it is merely cumulative, would tend to confuse or mislead the jury, or because it would

consume an inordinate amount of time at trial. *See id.* at 572 (citing Tex. R. Evid. 403).

## Analysis

During the defense's case in chief, the State requested a Rule 702 hearing for Rory Carruthers, whom the defense proposed to call as a witness. Outside the presence of the jury, Carruthers testified that he is a licensed professional counselor, he often works with the VA, and that he had dealt with many veterans with PTSD or who had attempted suicide. Carruthers testified that he treated Sanders two different time periods—in 2021 to 2022 and again beginning in January of 2024. Carruthers agreed that he would testify about Sanders's state of mind in January of 2024 and forward based on his counseling sessions with Sanders, "the history of the veteran[,]" and clinical testing. Carruthers testified that he believed he could give an opinion on Sanders's state of mind when he tried to shoot himself. Carruthers agreed he had seen no offense reports or information about the case and he knew nothing other than what Sanders had told him.

The defense told the trial court that Carruthers could testify about the effect of the accusations against Sanders in the context of Sanders's military experience and that Sanders attempted suicide because he did not commit the offense. The trial court stated that it had not heard "the scientific or the technical or the specialized knowledge that would help the trier of fact to understand the evidence or to

18

determine a fact in issue." The State agreed, and it also argued that the defense had not given sufficient notice of this expert, and that because Carruthers's testimony related to the time period from January of 2024 forward, his testimony was not relevant. The trial court explained: (1) there was nothing in the indictment about an allegation of attempted suicide, and attempting to commit suicide was not for the jury's deliberation; (2) there was no evidence of Carruthers's specialized, technical, or scientific knowledge; (3) the trial court had not heard the actual opinion that would be given and that would help the trier of fact to understand the evidence or determine a fact in issue; (4) Carruthers's proposed testimony would relate to the time period beginning January 10, 2024 and forward; (5) the testimony might have a place in a punishment hearing; and (6) there was insufficient notice of the expert and his testimony. The trial court ruled that the expert's testimony should not be included under Rules 702 and 705.

Carruthers testified during the 702 hearing that he would offer a clinical opinion about Sanders's state of mind based on his "most recent" counseling sessions with Sanders, which began in January of 2024, which was after the alleged sexual assault and after the attempted suicide. Sanders's mental state during his counseling sessions or his mental state at the time of his suicide attempt was not a fact issue for the jury to decide. *See* Tex. R. Evid. 702 (an expert witness may testify about matters that will help the factfinder "to understand the evidence or to

19

determine a fact in issue."); *Nejnaoui v. State*, 44 S.W.3d 111, 118 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (trial court did not err in excluding expert testimony by the defendant's psychiatrist as not relevant to any issue before the jury because the expert had no personal knowledge of defendant's condition at the time of the offense). Additionally, Sanders himself testified about his military experience, his reactions when accused, and his suicide attempt, and the trial court could have concluded that Carruthers's testimony about Sanders's state of mind during his counseling sessions would be irrelevant, or redundant and cumulative. *See Buntion v. State*, 482 S.W.3d 58, 81 (Tex. Crim. App. 2016) (upholding the trial court's ruling excluding cumulative evidence).

The trial court also explained that in the Rule 702 hearing the defense did not identify any specialized, technical, or scientific knowledge that would form the basis for Carruthers's opinion testimony. Carruthers testified that he had been licensed as a counselor since October of 2018, and he had "several certifications through the VA[]" related to PTSD and suicide. However, Carruthers also testified that his testimony would be based on his counseling sessions with Sanders and on "the history of the veteran[.]" When a proposed behavioral science expert does not identify the principles of forensic psychiatry on which he relies nor does he rely on any peer-reviewed books, articles, journals, or other experts, the trial court may reasonably conclude that the proposed testimony does not meet the criteria for

20

admission as expert testimony. *See Coble v. State*, 330 S.W.3d 253, 278-79 (Tex. Crim. App. 2010). The trial court could have reasonably concluded that the defense failed to sufficiently establish that Carruthers's opinion would be based on scientific, technical, or other specialized knowledge. *See id.* Additionally, here Appellant concedes that the defense failed to timely disclose the witness under the trial court's scheduling order. Based on the record before us, we conclude that the trial court did not abuse its discretion by excluding the testimony of Carruthers because the defense failed to meet the criteria in Texas Rule of Evidence 702 and *Kelly*. *See* Tex. R. Evid. 702; *Kelly*, 824 S.W.2d at 572.

That said, even if the trial court erred in excluding the witness, we find no harm. Generally, the erroneous admission or exclusion of evidence is non-constitutional error if the trial court's ruling merely offends the rules of evidence. *See* Tex. R. App. P. 44.2(b); *Walters*, 247 S.W.3d at 218-19; *Solomon*, 49 S.W.3d at 365. Reversal is required only if the exclusion of the evidence affected a substantial right of the defendant. *See* Tex. R. App. P. 44.2(a); *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000).

Kayla testified that Sanders instructed her to wear loose shorts and no underwear when he gave her a massage. She also testified that during the massage Sanders gave her on Father's Day in 2023, Sanders put his finger inside her vagina and moved his finger around. Kayla reported the incident to her mother the next day.

21

The forensic examiner nurse testified about her examination of Kayla and Kayla's outcry, and the nurse's testimony was consistent with Kayla's and Melodie's testimony about the incident. Kari Prihoda, the forensic interviewer at Children's Safe Harbor, testified that Kayla made a quick outcry during the interview, Kayla did not recant anything, and Kayla's report included sensory details. Sanders denied that he sexually assaulted Kayla but he agreed he gave her a massage on the day in question, and he agreed that Kayla told him he was getting close to her "no-no" spot.

The jury was permitted to believe or disbelieve any part of a witness's testimony, including the defendant's testimony. *See Jones v. State*, 984 S.W.2d 254, 258 (Tex. Crim. App. 1998) (en banc). The testimony of a child victim is sufficient to support a conviction for sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07; *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978); *see also Lee v. State*, 176 SW.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006). Appellant provides no support for his assertion that Carruthers would have explained "how a person with combat experience would react to accusations of sexual assault differently than a normal person[,]" nor do we find any such evidence in the record during the Rule 702 hearing. We conclude that Appellant's assertion that the jury would likely not have convicted him had they heard from Carruthers is conclusory and insufficient to obtain a reversal. *See Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (the failure to brief

22

whether alleged error caused harm waived the issue on appeal); *Chaves v. State*, 630 S.W.3d 541, 558 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (rejecting appellant's conclusory assertion, without citation to authority or analysis, that he was harmed by the trial court's admission of certain evidence).

We conclude that the trial court's ruling excluding Carruthers's testimony was within the zone of reasonable disagreement, and we find no error nor any basis for reversal. *See De La Paz*, 279 S.W.3d at 343-44; *Cardenas*, 30 S.W.3d at 393. We overrule Appellant's issue on appeal, and we affirm the trial court's judgment of conviction.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on May 19, 2025
Opinion Delivered July 30, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Chambers, JJ.